NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1192

STATE OF LOUISIANA

VERSUS

ERNEST R. BILLIOT

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 55085
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.

CONVICTIONS AFFIRMED.  SENTENCES AFFIRMED, IN PART,
AND VACATED AND REMANDED, IN PART.

**Emma J. DeVillier**
**Kleinpeter, Schwartberg, et al**
**P.O. Box 2626**
**Morgan City, LA 70381**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**Brent A. Hawkins**
**Louisiana Appellate Project**
**P. O. Box 3752**
**Lake Charles, LA 70602**
**(337) 502-5146**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ernest R. Billiot**

**Matthew B. Derbes**
**Assistant Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6200**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**SAUNDERS, Judge.**

On March 19, 2012, the Defendant, Ernest Billiot, was charged by bill of information with one count of sexual battery, a violation of La.R.S. 14:43.1, and one count of second degree kidnapping, a violation of La.R.S. 14:44.1. On that same date, the Defendant entered pleas of not guilty to the charges. Additionally, on March 19, 2012, the State filed a Motion to Invoke Firearm Sentencing Provisions. The State filed another Motion to Invoke Firearm Sentencing Provisions on July 5, 2012. After a trial by jury held from November 27, 2012, until November, 30, 2012, the Defendant was found guilty as charged on both counts. Thereafter, on March 20, 2013, the Defendant filed a "Motion and Order for Post Verdict Judgment of Acquittal and Motion and Order for New Trial." The trial court denied the motions on March 22, 2013. At the March 22, 2013, hearing, the State moved to have a hearing on its motion to invoke the firearm sentencing enhancement. After hearing argument, the trial court reset sentencing in order to allow the Defendant to exercise his right to a twenty-four delay between the denial of a motion for new trial and sentencing.

On April 19, 2013, after considering the presentence investigation report and the factors set forth in La.Code Crim.P. art. 894.1, the trial court sentenced the Defendant on the sexual battery count to five years at hard labor, without benefit of parole, probation, or suspension of sentence. On the second degree kidnapping count, the trial court sentenced the Defendant to twenty years at hard labor, ten years suspended, with the first ten years to be served without benefit of parole, probation, or suspension of sentence "in accordance with the Motion to Invoke the Firearm Sentencing provisions . . . ." Although the trial court did not specifically state that he was placing the Defendant on probation and failed to specify the amount of time the Defendant would serve on probation, the trial court imposed

certain conditions of probation. The trial court also advised the Defendant that he would have to register as a sex offender for fifteen years. Finally, the trial court recommended the Defendant be housed in a facility that can treat his medical problems, and the trial court ordered the sentences to run concurrently.

On April 23, 2013, the Defendant filed a Motion and Order for Appeal, which the trial court granted on April 25, 2013. The Defendant is now before this court, alleging two assignments of error.

**FACTS:**

While driving home in the early morning hours of February 17, 2008, the victim was pulled over by the Defendant, a Delcambre police officer. The Defendant accused the victim of almost hitting him and asked the victim if she had been drinking. The Defendant put the victim in the back of his police car and took her to the police station for a breathalyzer test. Once at the police station, the Defendant told the victim he needed to search her for drugs. While in the bathroom, the Defendant asked the victim to open her bra and pull down her pants. The Defendant then made the victim put her hands up against the wall and proceeded to search the victim from the ankles up. When the Defendant touched the victim's vagina, the victim told him to stop. The Defendant took the victim back to her car, and the victim subsequently called 911.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there is an error patent regarding the sentence imposed on the charge of second degree kidnapping which requires the sentence to be vacated and remanded to the trial court for resentencing.

The court minutes provide in pertinent part:

> [O]n the Sexual Battery charge to serve: FIVE (5) YEARS AT HARD LABOR WITHOUT BENEFIT AT THE DEPARTMENT OF CORRECTIONS WITH CREDIT FOR TIME SERVED; on the Second Degree Kidnapping charge, the defendant is to serve: TWENTY (20) YEARS AT HARD LABOR WITH ALL BUT TEN (10) YEARS SUSPENDED, IN WHICH REMAINING TEN YEARS IS TO BE SERVED WITHOUT BENEFIT AT THE DEPARTMENT OF CORRECTIONS WITH CREDIT FOR TIME SERVED; FIVE (5) YEARS SUPERVISED PROBATION. Each sentence is to run CONCURRENT with each other and CONCURRENT with any other sentence the defendant is presently serving. As a special condition of probation upon release, the defendant is not to obtain any type of employment where a requirement or allowance of carrying a weapon is mandated.

The transcript of sentencing provides in pertinent part:

> I am going to order, therefore - - that on the sexual battery count, I'm going to order that you serve five years at hard labor, without benefit of parole, probation or suspension of sentence.
>
> On the second degree kidnapping, I'm going to order that you serve twenty years at hard labor. I'm going to suspend ten of those years. The first ten, however, will be imposed without benefit of parole, probation or suspension of sentence in accordance with the Motion to Invoke the Firearm Sentencing provisions - - the motion that was filed by the State.
>
> I'm also going to add special conditions of your probation. When you get out, one is that you not obtain employment wherein you would be required or even allowed to carry a weapon.
>
> I'm going to recommend that you be housed in a facility where you'll get offender specific treatment with DOC.
>
> And another condition of your probation that you undergo a psychological evaluation and comply with any recommended follow-up treatment.

In this case, the court minutes conflict with the sentencing transcript. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. The sentencing transcript indicates the trial court failed to place the defendant on probation and specify the number of years he

was to serve on probation, as required by La.Code Crim.P. art. 893. Louisiana Code of Criminal Procedure Article 893 provides in pertinent part:

> A. When it appears that the best interest of the public and of the defendant will be served, the court, after a first or second conviction of a noncapital felony, may suspend, in whole or in part, the imposition or execution of either or both sentences, where suspension is allowed under the law, and in either or both cases place the defendant on probation under the supervision of the division of probation and parole. . . . . The period of probation shall be specified and shall not be less than one year nor more than five years.

In *State v. Willis*, 95-316 (La.App. 3 Cir. 10/4/95), 663 So.2d 392, the trial court suspended the defendant's sentence without placing him on probation as required by Article 893. This court vacated the sentence and remanded the case for resentencing pursuant to La.Code Crim.P. art. 893, citing *State v. Fann*, 597 So.2d 1230 (La.App. 3 Cir. 1992). Thus, the Defendant's second degree kidnapping sentence is vacated and remanded to the trial court for resentencing in accordance with La.R.S. 14:44.1 and La.Code Crim.P. arts. 835 and 893.

## ASSIGNMENT OF ERROR NO. 1:

The Defendant alleges that the evidence was insufficient to convict him of either second degree kidnapping or sexual battery. The Defendant claims that he did not commit the offenses and that the victim's testimony contained internal contradictions and irreconcilable conflicts with physical evidence to such an extent that her testimony was not sufficient to find the Defendant guilty.

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger,* 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678

(La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford,* 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson,* 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano,* 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94-3116 (La.10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan,* 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert,* 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother,* 09-2357, pp. 10-11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449.

Several witnesses testified at the Defendant's trial, but only one witness was an eyewitness - the victim herself. The victim testified that on February 16, 2008, she ate dinner with a friend and then went to some local bars to watch a band. While traveling home sometime after midnight on February 17, 2008, the victim passed a police car traveling in the opposite direction. The victim then noticed the police car's lights shining behind her. The victim stopped on the shoulder of the road. According to the victim, she stopped on Highway 14, between the Texaco station and the "dollar store." The police officer, whom the victim later identified as the Defendant, used a "speaker thing" to tell the victim to get out of her car. When the victim exited her car and handed the Defendant her driver's license, the victim asked why she was being stopped. The Defendant said she had almost hit him head on and asked the victim if she had been drinking. Even though the victim drank a glass of wine at dinner, she told the Defendant that she had not been drinking. At trial, the victim explained that she did not tell the Defendant about the wine because she was not impaired. The victim also testified that she had been arrested for a DWI in 2006.

According to the victim, the Defendant told her that he thought she had been drinking and that he wanted to take her "downtown" to get a breathalyzer test. Before the Defendant put the victim in the back of his car, he frisked her for weapons. The victim testified that the Defendant took her to the Delcambre Police Department, which the victim described as a trailer with metal stairs. Once inside the trailer, the victim asked the Defendant if she could go to the bathroom. The Defendant checked the victim's pupils and let her go into the bathroom. When the victim came out of the bathroom, the Defendant told her that he needed to search her for drugs. The victim described the ensuing events as follows:

So I proceeded to go to the bathroom with him. It was just him and I in the building the whole time. In the bathroom, he asked me to lift my shirt up. I did it because, you know, he asked me to do it. He's a police officer and I'm trying to prove him wrong. I lifted my shirt up. He said, "Open your bra." I opened my bra. "Okay. Put it down. I need you to pull down your pants." I looked at him. I was like, "Why?" "Because I need to search you. I need to see if you have anything on you." I said, "Okay." I mean, you know, he's a police officer with a gun. He said, "Put your hands up against the bathroom wall." I did. "Spread your legs." So he proceeded to, you know, search me from my ankle on up.

And when he got to my vagina area - - I'm sorry to say it like this - - I was like - - I flinched and I was like, "What are you doing?" He said, "Well, I need to see if you have anything up there." I was like, "Why?" He said, "Because you might have some drugs up there." I was like, "No, I don't." And at that point, I was like really, "No," you know.

When asked if the Defendant actually touched her in her "vagina area," the victim replied, "Yes, he was proceeding to put his fingers up there to see if I had anything up there." When the victim objected, the Defendant told her to put her clothes back on and meet him in the office.

The victim also testified that the Defendant kept asking her if she had a boyfriend. According to the victim, the first time the Defendant asked her this was when she first got out of her car. While at the police station, the Defendant kept asking the victim if she had a boyfriend and commenting that she was too pretty not to have a boyfriend. Although the victim took it as a compliment, she also felt like the Defendant was flirting with her.

The victim testified that the Defendant did not give her a breathalyzer test, and, in fact, she did not see a breathalyzer machine at the office. The Defendant brought the victim back to her car and told her he was going to follow her home to make sure she arrived home safely. Before she left, the Defendant asked her for her number so that he could call her for a date. According to the victim, she gave

him a wrong number, which he wrote on his hand. The victim also testified that the Defendant kissed her on her lips.

Before getting out of her car when she arrived home, the victim called her friend, Jared Menard. The victim verified that her phone records showed that she called Jared at 2:23 a.m. When the victim told Jared what happened, Jared asked her if anyone was in the building with her. Jared told the victim that someone was supposed to be present when she was searched and urged the victim to call 911. The victim immediately called 911. According to the victim, she called 911 twice and spoke to Chief James Broussard each time. The 911 recordings were played for the jury during the victim's testimony. During the first call, the victim described the Defendant as a "fat cop" and said he made her take her pants off and "felt her up and down." The victim urged Chief Broussard to go look at the Defendant's wrist so that he could see where the Defendant wrote the victim's number. The victim called back a second time to see if Chief Broussard looked at the Defendant's hand. During this call, the victim told Chief Broussard that the Defendant kissed her on the lips. During both calls, the victim threatened to call her lawyer.

At trial, the victim explained that during the 911 calls, she did not feel like Chief Broussard was taking her seriously. She stated that she told the chief that she was friends with the Youngsville Police Chief's son so that he would take her seriously. The victim also mentioned her lawyer for the same reason. The victim explained that she did not know someone was supposed to be present during the search until Jared told her and that when she found this out, she became very angry and upset.

After a couple of days of not hearing from Chief Broussard, the victim called the Vermillion Parish Sheriff's Office. Still not feeling like the matter was

8

being investigated promptly, the victim went to the State Police. The victim admitted that she initially told the police that she was not drinking alcohol on the night in question. She explained that she was afraid they would not take her seriously. In her statement, however, she admitted to drinking alcohol on the night in question. At that point, she knew they were investigating, and she wanted to tell the whole truth. Although she did not remember all of the details she gave in her interview with the State Police, the victim remembered describing the Defendant as a "white Caucasian . . . fat . . . brown hair, thick." The victim also stated that the Defendant was wearing a black jacket with a U.S. Customs patch. The Customs patch caught the victim's eye because she thought it was strange for a Delcambre police officer to have such a patch. The victim did not notice the Defendant's name.

The victim described the car driven by the Defendant as a white car with a Delcambre Police Department logo on it. The lights on the car were a bar type, not round. The victim described the police station as a trailer with metal stairs. The bathroom, according to the victim, had a toilet and a sink with some chemicals on the floor. The victim testified that she was shown a photo line-up, and she picked photo "number 2." The State noted for the record that photo "number 2" is a picture of the Defendant. The victim also identified the Defendant in court as the person who stopped her on the night in question.

The victim also testified that she filed a civil lawsuit in February 2009. The victim stated that she filed the civil lawsuit because she was not satisfied with the progress of the criminal case. Once the victim saw that the Attorney General's Office was handling the criminal matter in a satisfactory manner, she dropped the civil lawsuit.

9

On cross-examination, defense counsel asked the victim lots of questions about the fact that she has used different last names. The victim testified that she had been married twice, was currently divorced, and was currently using her maiden name. The victim admitted again that she initially lied about not drinking on the night in question. The victim also reviewed her February 21, 2008, interview with Officer Bouillion, wherein she stated that the last business she remembered passing before she was stopped by the Defendant was a Chevron station. Defense counsel asked the victim if it was a Chevron station or a Texaco station. The victim replied that the Chevron station changed to a Texaco station. The victim also admitted that on the 911 call, she did not mention the fact that the Defendant used a loudspeaker to tell her to get of the car. Additionally, the victim admitted that she did not tell the 911 dispatcher that she retrieved her insurance papers and license from her glove compartment. The victim testified that she might have missed some things when she first spoke to the 911 operator because she was upset. According to the victim at trial, the Defendant gave her a sobriety test by making "her walk the line" right before he frisked her for weapons and put her in his car. Regarding the sobriety test, defense counsel asked the victim about the following statement she made in her interview with the State Police: "So he checked my eyes for dilation. He never did a breath test on me or a sobriety test on me." At trial, the victim explained that she meant that he did not give her a breath test. Thereafter, the following colloquy took place between the victim and defense counsel:

> Q: When you called 911 on the night in question, "He told me he was, you know, he checked my - - he did the sobriety test and I passed it. Well, he asked me to go back in the bathroom." Let me ask you, two totally conflicting statements. One is the 911 call right here. You said he gave you the sobriety test, correct?

A: The sobriety test as in checking my eyes for dilation and making me walk a line before I got in his car, outside of my car on Highway 14.

Q: I understand. But here you told him that he did the sobriety test. You told 911 that, correct?

> BY MS. DEVILLIER: Objection, Your Honor. Asked and answered.

> BY THE COURT: It has been. Sustained.

BY MR. ALLEN:

Q: On the next one, you told Officer [Bouillon] that you didn't do it. You didn't do the sobriety test.

A: Maybe I - - the sobriety test that I'm telling Officer [Bouillon] was the breathalyzer test. That's what I meant.

. . . .

BY MR. ALLEN:

Q: The question in this scenario would be did you or did you not do the sobriety test?

A: I did the sobriety test as in he put the pen in my eyes to see if they were dilated and I passed it.

As for the Defendant kissing her on the lips, the victim admitted that she did not tell Chief Broussard about the kiss during the first 911 call. The victim also testified that the Defendant was concerned about her getting wet so he told her to hurry and get in the car. She admitted at trial that she had not told anyone this before.

When defense counsel asked the victim why she didn't call 911 as soon as she got back to her car, the victim replied:

> Because I did - - like, I said, I didn't think - - I didn't know he had did something wrong. I didn't like what he did, but I didn't know that it was against the law for him to search me without a female officer present until my friend, Jared - - my friend, Jared, told me. I was like, "Really? I was supposed to have a female" - - I've never been in that situation before to where I was searched like that.

11

The victim described the Defendant's Customs patch as yellow and stated that no other patches caught her attention. The victim also remembered seeing the Defendant's badge but not his name.

The victim testified that at a previous job, she filed a complaint for sexual impropriety. The victim alleged that a man kept asking her when they were going to have sex. The victim reported the behavior to human resources and was fired a couple of months later.

On redirect, the victim stated that she would never have agreed to the type of search the Defendant performed on her had she not believed he was doing it in the line of duty. Additionally, the victim stated that she only got in the car with the Defendant because he was a police officer and she had no choice.

Chief Broussard testified that the Defendant was the only officer working the evening of February 16, 2008. At that time, the police station was a temporary trailer set up after Hurricane Rita. The police station did not have a breathalyzer machine. The chief remembered that he was very ill on the night in question and was taking medication. At approximately 2:45 in the morning, Chief Broussard received a call from the victim. The chief did not remember the details of the phone call but remembered that the victim said an officer stopped her and searched her inappropriately. After receiving the phone call, Chief Broussard called the Defendant. According to Chief Broussard, he asked the Defendant if he made a traffic stop on a female with the victim's name. The Defendant denied making the stop. When asked by the State if he was sure he told the Defendant the name of the woman that called him, Chief Broussard stated he was about 80% sure. When he referred to his March 6, 2008, interview, however, Chief Broussard stated that he did not remember if he told the Defendant the name of the woman who made the complaint.

According to Chief Broussard, in 2008, his police department had three police units. When asked which unit the Defendant was driving on February 16, 2008, Chief Broussard stated that the Defendant normally drove the unit with the light bar on top. Chief Broussard testified that the unit driven by the Defendant was the only vehicle with a light bar on top in 2008. Chief Broussard testified that his policy on traffic stops is that the officer must call in the license plate and location of the car being stopped. The chief also strongly urges his officers to call in their beginning and ending mileage if they are transporting a female subject. As far as Chief Broussard knew, the Defendant normally called in his stops. Chief Broussard testified that there was nothing showing that the Defendant made a stop on the night in question. Chief Broussard remembered that the Defendant was commissioned for the U.S. Customs but did not remember a Customs patch being on the Defendant's jacket.

On redirect, Chief Broussard testified that his policy on strip searching females is that a female officer must conduct the search. Chief Broussard stated that it is inappropriate for a male to search a female. Finally, when asked if he would ever rehire the Defendant, Chief Broussard responded, "Probably not."

Jared Menard testified that he was the victim's friend in February, 2008. Jared remembered receiving a call from the victim at approximately 2:22 a.m. on February 17, 2008. The victim was crying and upset because "she got stopped by a cop and she felt that maybe she was violated, but she didn't know." The victim called Jared to see what he thought. After hearing what happened, Jared told the victim to call the cops. According to Jared, the victim described the cop as a "big guy."

On cross-examination, Jared testified that he told the victim that he did not think it was right for a male officer to search her without a woman officer present.

13

Jared stated that the victim did not tell him that the Defendant said he was going to follow her home and did not tell him that the Defendant kissed her. The victim did tell him, however, that she had been drinking that night. On redirect, Jared testified that he believed the victim.

Mitch Pommier, an officer with the Erath Police Department, testified that he was a patrolman in 2008. In February 2008, Officer Pommier worked nights and did not have a Customs patch on his uniform. According to Officer Pommier, he saw the Defendant on the night in question. At the beginning of the shift, Officer Pommier met the Defendant at the Delcambre Police Department "to do some things on the computer." Officer Pommier described the Defendant on the night in question as having a moustache and goatee. Officer Pommier stated that the Defendant was the only officer working for the Delcambre Police Department that night and that the Defendant had a gun. In fact, Officer Pommier testified that every time he saw the Defendant on duty, the Defendant carried a service weapon.

Officer Pommier saw the Defendant again on the night in question around midnight or "one" at the Texaco station. Then, Officer Pommier did not see the Defendant again until approximately 3:45 a.m., at which time the Defendant met Officer Pommier and a sheriff deputy to investigate a blown transformer outside of town. At the 3:45 call, the Defendant told Officer Pommier that a female subject had filed a complaint against him with the Chief. At trial, Officer Pommier remembered the Defendant telling him the name of the "female subject" but could not recall the name. When his memory was refreshed with the transcript of his March 2008 statement to State Police, Officer Pommier remembered that when the Defendant arrived at the 3:45 a.m. call, he said the "female subject" was the victim.

Officer Pommier also recalled that in his March 2008 statement, he commented that the Defendant seemed different at the 3:45 a.m. call, like he was very tired and could not keep his head up. Additionally, at trial, Officer Pommier testified that the day after the 3:45 a.m. transformer call, the Defendant had shaved off his goatee and just had a moustache. When reminded of his previous statement, however, Officer Pommier remembered that the Defendant had a moustache the night of the 3:45 a.m. transformer call and that the Defendant had shaved off the moustache the next day. When asked if he found that unusual, Officer Pommier replied, "I guess."

On cross-examination, Officer Pommier testified that several different law enforcement agencies patrol Highway 14. Officer Pommier further testified that on the night in question he was driving his standard police unit with the light bars on top. Officer Pommier was wearing a black uniform and weighs approximately 370 pounds. Officer Pommier did not recall if he made any stops on the night in question. According to Officer Pommier, the Defendant frequently shaved off his moustache and beard. Officer Pommier was also aware that the Defendant had diabetes, which can cause a person to be "tired and lackadaisical." Finally, Officer Pommier testified that he does not know whether the Defendant came into contact with the victim on the night in question.

Joshua Hebert of the Abbeville Police Department testified that he saw the Defendant on the night in question. In 2008, Officer Hebert worked for the sheriff's office and drove a vehicle with a light bar on top. At approximately 1:30 in the morning on February 17, 2008, Officer Hebert was parked under the canopy at the Texaco gas station. At that time, both Officer Hebert and the Defendant were parked under the canopy by the carwash on the East side of the Texaco station. At approximately 1:30 a.m., Officer Hebert left to respond to a call.

15

Officer Hebert took a right out of the Texaco parking lot and headed west towards Abbeville. Since the night in question, Officer Hebert has looked at surveillance video and identified the Defendant's unit also leaving the Texaco station and heading east. Officer Hebert saw the Defendant again at 3:30 a.m. when they responded to the power outage call. At that time, the Defendant told Officer Hebert of the accusation made against him.

On cross-examination, Officer Hebert testified that he did not see the Defendant leave the Texaco station. When asked if he had seen any videotape of the Defendant leaving the lot, Officer Hebert responded:

A: No, sir. The only thing I was shown was a couple of pictures just to verify if it was my car or his.

Q: And you verified that it was his car?

A: Yes, sir.

Q: Could you tell that it was leaving the lot?

A: Yes, sir.

Q: Could you tell where it was going?

A: Yes, sir. It was south through the carwash area.

Q: Do you know where it ended up?

A: No, sir. The last picture that I was shown was it was going through the carwash south.

Q: Okay. So it could have ended up right back on the property and you wouldn't know, correct?

A: Yes, sir.

Kacey Amarello from the Louisiana State Police Crime Lab testified as an expert in forensic fingerprint analysis. Ms. Amarello testified that she received a black cloth purse and two driver's licenses belonging to the victim for examination. Ms. Amarello determined that the purse was not suitable for

16

fingerprint processing. Additionally, no prints were developed on the driver's licenses.

Allyson Saadi of the Louisiana State Police Crime Lab testified as an expert in DNA analysis and extraction. Ms. Saadi swabbed a driver's license and ID card and compared the swab to reference samples from both the victim and the Defendant. Although the victim could not be excluded as a contributor to the DNA found on the ID card, the Defendant was excluded as a contributor to the DNA found on the ID card. As for the driver's license, there was a major and a minor contributor. The victim could not be excluded as the major contributor, and the minor contributor was "present at such a low concentration that no conclusions could be obtained . . . ."

The final witness to testify for the State was Detective Bart Bouillion of the Louisiana State Police. Once assigned the case, Detective Bouillion interviewed the victim in February 2008. According to Detective Bouillion, the victim described her assailant as a person dressed as a police officer driving a car that had emergency lights like a police officer. The victim stated her assailant was a white male, chubby, with thick brown hair and buck teeth. The victim also stated that her assailant wore a jacket with a U.S. Customs patch. When shown a photographic line-up, the victim picked out number two. The victim got upset and started to cry because seeing the photograph brought back memories from the night in question.

During his investigation, Detective Bouillion determined the incident occurred between 1:48 a.m. and 2:22 a.m. on February 17th. Detective Bouillion testified that when he viewed all of the camera angles from the Texaco station, he saw the Defendant's vehicle at 1:48. According to Detective Bouillion, the next time he saw the Defendant on the camera was at 2:22 a.m. At that time, Detective

Bouillion saw the Defendant walk through the front door and walk toward the restroom area. Although Detective Bouillion could not remember if the Defendant had a jacket on at 2:22 a.m., he remembered seeing the Defendant with a jacket on previously that same night.

Detective Bouillion also testified that the Delcambre Police Station is about three minutes from the area on Highway 14 where the victim claims she was stopped. As part of his investigation, Detective Bouillion took pictures of the police station. One of the pictures of the police station bathroom showed cleaning supplies. Detective Bouillion testified that the picture of the bathroom matched the description given by the victim. According to Detective Bouillion, he also took a picture of the Defendant's jacket, which Detective Bouillion stated matched the description given by the victim. The photograph of the steps at the police station as well as a photograph of the Defendant's sidearm both matched the description given by the victim.

Detective Bouillion identified a statement written by the Defendant on February 17, 2008, at 3:25 a.m. According to Detective Bouillion, the Defendant's phone records show that Chief Broussard called the Defendant at 3:05 a.m. Thus, the Defendant's written statement was made twenty minutes after Chief Broussard called him. When asked if the Defendant refers to the complainant by name in his written statement, Detective Bouillion responded as follows:

A: No, he refers to her as the unknown female who he had allegedly stopped and brought to the PD.

Q: You had interviewed Mitch Pommier also?

A: Yes, sir.

Q: And at three forty-five, the defendant gives the name [of the victim] to Mitch Pommier?

A: Yes, sir.

18

Q: After writing this statement and not having talked to the Chief or anybody who could have given him that name, correct?

A: Yes, sir.

In his written statement, the Defendant denied making any traffic stops and denied taking anyone to his office. The Defendant claimed that he had been parked at the Texaco station for the past three hours and talked to Deputy Josh Hebert, Officer Joel Terrebone, and both cashiers at the Texaco station. The Defendant also stated that he had no idea who the female complainant was or what her motive might be.

On cross-examination, Detective Bouillion testified that he did not believe the victim described the Customs patch in any of her 911 calls. Additionally, Detective Bouillion did not recall the victim mentioning the fact that the Defendant spoke over a microphone when he asked her to get out of her car. When asked by defense counsel how he established the time of the alleged stop, Detective Bouillion replied:

Q: From going to the video store, first of all, trying to find any video surveillance that didn't show on there. But I also used the phone records he provided, looked for any gaps, like where there might have been additional amount of time where something could have occurred. And in doing that, and in looking at the video, and seeing him leave, that's where I came up with the time frame - - with that time frame.

Q: Now, on the tape, we heard you say the stop occurred at two zero seven?

A: Yes, sir.

Q: You're sticking by that or did you stick by earlier, you testified at one forty-eight. Which one?

A: Well. I know the stop didn't happen at one forty-eight because we all see him driving from the carwash at one forty-eight. The two zero seven - - saying the stop happened at two zero seven was like we use props in the interview. And it was something I had told him. It's not that that's the definite exact time that the stop occurred at two zero seven. It could have been at two zero three. It could have been at two

19

zero nine. I don't know. But I know it was between one forty-eight and the two twenty-two, in my opinion.

Detective Bouillion admitted that he had nothing showing that the Defendant made the stop on the victim. Detective Bouillion also admitted that the victim's description of the Defendant's Custom's patch was not exactly accurate. Although the victim told Detective Bouillion that the Defendant said he was going to follow her home, Detective Bouillion stated that he did not hear the victim state such in the 911 calls. Finally, after looking at the surveillance video again, Detective Bouillion conceded that it was possible that the Defendant did exactly what he said he did on the night in question – instead of leaving the parking lot of the Texaco station, he "circled the building, went in the back, and pulled up right on the side in the drive-thru[.]" On re-direct, Detective Bouillion and the Prosecutor had the following colloquy regarding the Defendant's whereabouts between 1:48 and 2:22 a.m. on the night in question:

> Q: Like my dad once told me, anything's possible. But based on the statement that he had given to you about circling - - going east on - - finally, after he changed it numerous times - - about finally going east on 14 and coming to check around on the trucks, that truck lot is over here (indicating), correct?
>
> A: Yes, sir.
>
> Q: We've already watched it to know that you don't see any headlights from that time frame from one forty-eight to two twenty-two coming from that truck lot, do you?
>
> A: That's correct.
>
> Q: By his own admission to you and that statement we watched, based on the route he said he took - - he keeps changing it up - - but you don't see him coming on there, do you?
>
> A: No, sir.

Detective Bouillion testified that no phone calls were made from the Defendant's phone between 1:52 and 2:25 a.m. During the victim's testimony, the

20

victim testified that her phone records show that she also had no phone calls between 1:56 and 2:22 a.m. From 12:00 up until 1:56 a.m., however, the victim made ten phone calls, and then from 2:23 to 3:30 a.m., the victim made eleven phone calls.

For the first witness in its case in chief, the Defendant introduced the testimony of Anna Suire, the cashier at the Texaco station on the night in question. That night, Ms. Suire worked from 10:00 p.m. on February 16, 2008, to 6:00 a.m. on February 17, 2008. According to Ms. Suire, the Defendant checked on the Texaco station that night, left to make his rounds, and then went back to the station. When asked if she saw the Defendant leave the Texaco station between the hours of 11:00 p.m. and 3:00 a.m., Ms. Suire responded, "Not to my recollection. I know he had went make his rounds. But as far as for that, I mean, I don't know how - - you know, if he left again after that." Ms. Suire also stated that she did not observe the Defendant make any traffic stops between the hours of 11:00 p.m. and 3:00 a.m.

On cross-examination by the State, Ms. Suire stated that she remembered on the night in question having to call the Defendant inside the store to see about some kids misbehaving in the store. According to Ms. Suire, the kids usually came in the store about the time the biscuits were being made. Ms. Suire told police that the biscuits were put in around 2:00 or 2:30 a.m. and would be served between 2:30 and 3:00 a.m. Ms. Suire also testified that she remembered the Defendant getting a call from the Chief and coming to the window with his phone. When asked if 2:58 a.m. was the time of the call, Ms. Suire testified that she did not know the time but agreed that that time sounded about right. Ms. Suire agreed that when the Chief called, she told him that the Defendant had been at the station the entire time the incident allegedly occurred. According to Ms. Suire, the Defendant was

21

in her view that night. Ms. Suire stated that the Defendant was "along the parking lot . . . closer towards the street" during the time of the incident. Ms. Suire admitted, however, that she did not put in her statement to police that the Defendant was at the Texaco station between 1:58 and 2:58 a.m.

The next defense witness, Ronald Morvant, worked at the Texaco station on the night in question from "ten to six in the morning." On that night, he first saw the Defendant at 9:30 p.m., when Mr. Morvant and the Defendant drank a cup of coffee together. According to Mr. Morvant, the Defendant was in the back of the building, sitting in his car. Mr. Morvant testified that he saw the Defendant throughout the night and never saw the Defendant leave to make a stop. On cross-examination, Mr. Morvant testified that he was sure that he drank a cup of coffee with the Defendant at 9:30 p.m., even if others testified that the Defendant was at the police station at 9:30 p.m. Finally, on re-direct, Mr. Morvant testified that he would have been able to see the Defendant from 1:00 to 2:00 that morning but would not have seen him from 2:00 to 3:00 a.m. since he was making biscuits at that time. Between 3:30 and 4:30 a.m., the Defendant escorted some kids out of the Texaco station because they were causing trouble.

Kathleen Latiolais testified that she ran a paper route for The Daily Iberian in 2008. On the night in question, Ms. Latiolais arrived at the Texaco station at approximately 2:10 a.m.. When she and her daughter arrived at the station, they saw the Defendant's vehicle parked on the side of the station. Ms. Latiolais testified that she and her daughter passed by the station about four times while running the route, and each time they saw the Defendant's car still at the station. According to Ms. Latiolais, she did not see the Defendant make a traffic stop that night.

22

The final witness to testify was Dena Standridge, Ms. Latiolais' daughter. Ms. Standridge testified that on February 17, 2008, she saw the Defendant at the Texaco station "a little after two." Ms. Standridge testified that she spoke with the Defendant that morning. When asked what time she spoke with the Defendant, Ms. Standridge replied:

A:  A little - - when we got there, I seen him sitting down and I started laughing at him because he - - I'm like, "That's a police officer." I said, "Instead of going patrol the town," I said, "He's sitting at the store watching the people." We made a joke out of it, me and my mom. And throughout the night we did because every time we passed, that's where he was sitting in the same spot. But I got out the vehicle and I hollered at him and asked him if he wanted a newspaper. And he hollered yes, and he walked across where he was parked on the side of Texaco. He walked across and I met him right - - almost even with the doors. I gave him the paper, asked him how he was doing. We talked about the weather a few minutes and I left.

Q:  Do you have any idea approximately what time that was?

A:  Probably about two fifteen, two twenty, somewhere in that area.

Q:  On that particular night, how many times did you and your mother pass by the Texaco station?

A:  Numerous.

Q:  Numerous times?

A:  Yes.

Q:  On each occasion was Mr. Billiot there?

A:  Yes, we laughed every time we passed at him.

Ms. Standridge testified that she did not see the Defendant making a stop.

In brief, the Defendant claims that his convictions were based on the uncorroborated testimony of the victim. The Defendant contends that the testimony of the victim should not be believed because it contained internal contradictions and conflicted with physical evidence. The Defendant argues that the victim's testimony contained internal contradictions because the victim did not

state prior to trial that the Defendant used a loudspeaker to order her out of the car. The Defendant additionally alleges that the victim contradicted herself by admittedly lying about drinking on the night in question. Finally, the Defendant contends that the victim's testimony is internally inconsistent because the victim failed to mention the Defendant's Customs patch during her 911 interview and during her interview with Detective Bouillion. According to Detective Bouillion, however, the victim did mention the Customs patch in her interview. The Defendant further claims that the victim's description of the Customs patch was wrong and that the victim failed to mention any of the other patches on the Defendant's jacket.

As for conflicting with physical evidence, the Defendant argues that there are no records of a traffic stop, no record of the Defendant's ending and beginning mileage even though he was transporting a female, no evidence that the Defendant ever failed to comply with the departmental policies of always recording his traffic stops and recording the mileage when transporting a female passenger, and no evidence of an intoxilyzer machine at the Delcambre Police Department. Additionally, the Defendant contends that the DNA evidence excluded the Defendant as a person that could have handled the victim's driver's license. Finally, the Defendant alleges that the victim did not know the name of the Defendant even though the Defendant had a name badge on his jacket.

In its brief, the State argues the following in response to the Defendant's suggestion that the victim's story was either fabricated or that she identified the wrong person:

> The facts of this case reveal that the victim dialed 9-1-1 when she arrived at her home in Erath at approximately 2:22 a.m. Her description to dispatchers was consistent with her interview with law enforcement, as well as her testimony at trial. She gave an accurate and complete description of the appellant, who was indeed on duty at

the time the incident occurred. She also later identified him in a photographic lineup. The appellant claimed to be parked at the Texaco station from midnight until 3:00 a.m. that day. However, video surveillance depicts the appellant leaving the gas station at 1:48 a.m. and not returning until 2:22 a.m., the same time that the victim dialed 9-1-1 to report the incident. The appellant's cell phone records also reflect inactivity during that period of time. The strong, circumstantial evidence proved that it was indeed the appellant who committed these crimes.

The only issue in this case is whether the Defendant committed the offenses at issue. It is well-settled that "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002) (citing *State v. Smith*, 430 So.2d 31 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221 (La.1982)). It is also well-settled that a victim's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that testimony does not contain internal contradictions or irreconcilable conflicts with physical evidence:

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La. 6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012).

Contrary to the Defendant's assertions, the victim's testimony does not conflict with physical evidence. The "evidence" that the Defendant claims conflicted with the victim's testimony – no evidence of a traffic stop, no evidence

of mileage, no intoxilyzer machine, and no DNA belonging to the Defendant on the victim's driver's license – actually constitutes an "absence" of evidence rather than actual physical evidence. This "absence" of evidence does not conflict with the victim's testimony. At best, it simply fails to corroborate the victim's testimony. Arguably, the fact that there was no evidence of a traffic stop, no evidence of the Defendant recording his mileage, and no evidence of an intoxilyzer machine supports a finding that the Defendant was trying to hide the stop. In this sense, the "absence" of evidence could be interpreted as corroborating the victim's testimony. Thus, we find no merit to the Defendant's allegation that the victim's testimony conflicts with physical evidence.

As for the Defendant's allegation that the victim testified inconsistently with prior statements and admittedly lied to police about drinking on the night in question, the jury chose to believe the victim's testimony despite these alleged inconsistencies. As this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

Furthermore, the inconsistencies alleged by the Defendant have nothing to do with the essential elements of the offenses charged. Finally, the victim's testimony was corroborated by the fact that neither she nor the Defendant made phone calls during the same period of time on the night in question, the fact that the victim immediately called a friend and reported what happened, the fact that the victim accurately described the police station and the police car, the fact that the victim

26

identified the Defendant in a photo line-up, and the fact that the Defendant was the only Delcambre Police Officer working on the night in question. The jury heard all of this evidence and weighed it against the evidence introduced by the Defendant in an effort to prove that he was at the Texaco station during the alleged incident. Obviously, the jury chose to believe the victim and the evidence that corroborated her testimony. This court is directed not to second guess the credibility determination made by the jury. Since the Defendant's only argument is that the victim's testimony was not credible, we find no merit to this assignment of error.

## ASSIGNMENT OF ERROR NO. 2:

In this assignment, the Defendant alleges that the State failed to prove by clear and convincing evidence that the Defendant was armed with a firearm during the commission of the second degree kidnapping; thus, the trial court erred in enhancing the Defendant's sentence under La.Code Crim.P. art. 893.3. The sentence for second degree kidnapping was vacated and the case remanded for resentencing on that count in the error patent section of this opinion. However, that this does not prevent this court from reviewing the merits of the trial court's determination that the firearm enhancement applied in this case.

Prior to trial, the State filed a Motion to Invoke Firearm Sentencing Provisions. The State alleged that the Defendant committed the offense of second degree kidnapping with a firearm. At trial, the victim testified that she complied with the Defendant's commands to search her because the Defendant was "a police officer with a gun." Another witness at trial, Officer Pommier, stated that the Defendant had a gun on the night in question and routinely carried a gun:

Q: Now, the night in question, February 16th, 2008, did you see Ernie that night?

27

A: Yes, I did.

Q: Did you interact with him that night?

A: Yes, I did.

Q: Before midnight, when is the last time you interacted with the defendant?

A: The beginning of the shift. I went meet him at the Delcambre Police Department to do some things on the computer.

Q: And he had to let you in the Delcambre Police Department?

A: Yes, he did.

Q: Because he was the only officer working that night, correct?

A: Correct.

Q: Did he have a gun?

A: Yes.

Q: And every time you've seen him working as a police officer, he had a service weapon, correct?

A: Correct.

Finally, Detective Bouillion testified that a photo of the Defendant's sidearm matched the description given by the victim.

After the jury convicted the Defendant of second degree kidnapping and sexual battery, a firearm enhancement hearing was held for the enhancement of the second degree kidnapping charge. At the hearing, the State argued the following:

> Thank you, Judge. The provisions of 893.2 are applicable here laying out - - if the Court finds - - the standard being clear and convincing evidence. And it says, "The burden in Paragraph C shall be upon the State to establish by clear and convincing evidence" - - moving on - - "Or actually possessed a firearm during the commission of a felony."

> And Paragraph D talks about, "If at anytime during or at the completion of the trial, the Court finds by clear and convincing evidence that the State has established that a firearm was used - - was discharged or used during the commission of a felony or actually

28

possessed during the commission of a felony," - - it goes on and talks about that's what triggers the effect of 893.3 and 893.1.

Your Honor, the Jury's standard was beyond a reasonable doubt, which is a much higher standard than clear and convincing evidence, an element of the second degree kidnapping which we proved to the Jury beyond a reasonable doubt.

And I would ask the Court to recognize that is exceeding the clear and convincing standard that the defendant was in possession of a firearm.

Second degree kidnapping, under Count 2, Your Honor, specifically was charged with the provision that he was armed with a dangerous weapon. The victim testified that he was armed with a dangerous weapon. The Jury heard the evidence.

We submit to the Court that he was in possession of a firearm at the time he committed this crime.

In response, defense counsel argued the following:

Your Honor, in response to it, I think that what we have to look at - - one, during the testimony at trial and the questioning by the State - - I don't think they ever established and asked any questions of whether or not - - because my client didn't take the stand, for one.

So I think that what they would have is a mere presumption that because he was on duty, that it would have been part of, I guess, his duty uniform. But there was no evidence ever established clear that he had a firearm on him. I mean, certainly, he could have possessed a taser. I mean, it was overnight. He was doing security at the Texaco and those types of things.

But I don't think when we look into the record that you will find that it's ever been established that Mr. Billiot possessed a firearm. And Mr. Billiot did not take the stand.

In his appellate brief, defense counsel argues that the jury's finding of guilt beyond a reasonable doubt that the Defendant committed the offense of second degree kidnapping, an element of which is being armed with a dangerous weapon, did not relieve the State of proving by clear and convincing evidence that the Defendant was armed with a firearm. Defense counsel further argues that the only testimony introduced at trial regarding the Defendant's possession of a firearm was the victim's statement that the Defendant was a police officer with a gun, and

Officer Pommier's statement that the Defendant had a gun earlier on the evening in question. Contending that these two statements were not sufficient to prove the Defendant possessed a firearm, defense counsel argues the following:

It is arguable that between the time Officer Pommier saw Appellant with his service weapon and when S.D. testified she saw Appellant with a gun, Appellant had removed his service weapon or even his duty belt and she was mistaken in her statement. In fact, it is not unreasonable at all to suggest [the victim]'s statement was a generalized statement about law enforcement officers in general and she in fact did not actually see him with a firearm, but assumed he had one because he was a police officer. [The victim] never testified where the gun was, what type of gun it was, if he touched his gun. This type of testimony would have provided greater indicia that Appellant was in fact armed.

Alternatively, the State could have introduced Appellant's service weapon into evidence at trial at which time they could have had [the victim] testify that was the weapon she saw Appellant with the night in question. The State was aware it needed proof the Appellant had a firearm on his person at the time of the alleged offense as one of the elements of the offense charged required he be armed with a dangerous weapon and since the State was seeking to have Appellant's sentence enhance[d] if he were found guilty.

Based on the foregoing, Appellate counsel suggest [sic] the State failed to prove by clear and convincing evidence Appellant was armed with a dangerous weapons [sic] as [the victim] testified to and thus, the trial court erroneously enhanced Appellant's sentence.

In response, the State argues that since the jury found the Defendant guilty of second degree kidnapping using the beyond a reasonable standard, the jury necessarily found the Defendant possessed a firearm beyond a reasonable doubt, thereby satisfying the clear and convincing standard for the firearm enhancement:

The fact that the appellant possessed his department issued firearm was proven at trial beyond a reasonable doubt, since it was one of the elements needed to prove a second degree kidnapping. If the appellant did not have his gun in his possession at the time of the kidnapping, he would have been acquitted of that charge. Since clear and convincing is a "more likely than not" standard, it only stands to reason that if a jury found that he possessed it during the kidnapping beyond a reasonable doubt, the State most certainly proved the clear and convincing standard as well. The[re] was no dispute that the appellant possessed his weapon during the commission of these crimes. He was on duty at the time, and the victim observed him with

his weapon. There is no merit to the appellant's argument that the evidence was insufficient to establish that he possessed a firearm during the commission of these felonies.

Since no new evidence was introduced at the firearm enhancement hearing, the trial judge obviously relied upon the evidence introduced at trial in making his decision to apply the firearm enhancement. According to La.Code Crim.P. art. 893.2, a trial court may rely upon the evidence introduced at the trial on the merits when deciding whether the State proved the possession of a firearm by clear and convincing evidence. As noted previously, there was evidence introduced at trial that the Defendant possessed a firearm on the night in question. The Defendant offered no evidence at trial to contradict this evidence. Since the Defendant was put on notice prior to trial that the State intended to invoke the firearms enhancement, the Defendant was given a full opportunity to contest at trial the State's allegation that he possessed a firearm and "thereby to preclude, if he could, a post-verdict finding of the trial court by clear and convincing evidence that he had used . . . a firearm during commission of the offense . . . ." *State v. Aaron*, 11-307, p. 3 (La. 6/24/11), 66 So.3d 18, 19. The Defendant offered no such evidence in this case. It is obvious from the evidence introduced at trial and the jury's verdict that the jury found the Defendant possessed a firearm beyond a reasonable doubt. Thus, the trial court did not err in finding the same evidence introduced at trial was sufficient to prove by clear and convincing evidence that the Defendant possessed a firearm for purposes of the firearm enhancement provision. Accordingly, this assignment lacks merit.

**DECREE:**

The Defendant's convictions are affirmed. The Defendant's sentence for sexual battery is also affirmed. However, the Defendant's second degree

kidnapping sentence is vacated and remanded to the trial court for resentencing in accordance with La.R.S. 14:44.1 and La.Code Crim.P. arts. 835 and 893.

**CONVICTIONS AFFIRMED. SENTENCES AFFIRMED, IN PART, AND VACATED AND REMANDED, IN PART.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules-Courts of Appeal, Rule 2-16.3.